UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | File No. 1:13-cr-62-jgm-01, 02 |
| | : | |
| KENNETH TRAPP and | : | |
| DANIELLE GODING, | : | |
| Defendants. | : | |
| _____ | : | |

<u>JOINT RULING ON MOTIONS TO SUPPRESS</u>
(Docs. 44, 45, 67)

I.      <u>Introduction</u>

        Defendants Kenneth Trapp and Danielle Goding are charged with conspiracy to distribute

narcotics in violation of 21 U.S.C. §§ 841(a)(1), 846.  (Doc. 19.)  Trapp moves to suppress evidence

obtained as a result of a vehicle stop in Fair Haven, Vermont on April 23, 2013, arguing his Fourth

Amendment constitutional rights were violated.  (Doc. 44.)[1]  Goding moves to suppress evidence

and all statements obtained as a result of a vehicle stop on I-87 in New York State.  (Docs. 45, 67.)

The government opposes both motions.  (Docs. 48, 49, 68.)  The Court held an evidentiary hearing

on December 16, 2013, and heard testimony from New York State Police Investigator Warren J.

Law and Trooper Jason Miller, Vermont State Police Trooper Andrew Todd, and Federal Bureau of

Investigation ("FBI") Special Agent Christopher Destito.  Trapp, Goding, and the government filed

additional briefing following the hearing.  (Docs. 57, 61, 62, 67, 68.)  For the reasons below, the

Court denies Trapp's and Goding's motions.

_____

        [1] The Court notes Trapp's motion to sever, filed together with his motion to suppress,
(Doc. 44) was denied as premature in a text-only Order on November 27, 2013.  Dkt. Entry No. 52
(Nov. 27, 2013).

II.   <u>Background</u>

The following facts are taken from the evidence presented at the December 16 hearing and other documents submitted as evidence by the parties.  The Court also viewed the video of Vermont State Police Trooper Todd's traffic stop recorded by his dashboard camera.  Gov't Ex. 6.  On April 23, 2013, at approximately 2 p.m., FBI Special Agent Destito called New York State Police Investigator Law.  Suppression Hr'g Tr. at 9, 11, Dec. 26, 2013 ("Hr'g Tr.").  Destito told Law he had been conducting an investigation and advised that a taxi carrying a male suspected of drug dealing would be approaching the outlet stores off Exit 20 in Lake George, New York, to meet with another person.  <u>Id.</u> at 9-10.  Law drove to the outlet stores and contacted New York State Trooper Miller, asking him to look out for a taxi coming from Vermont.  <u>Id.</u> at 11, 105.  Miller, who then was attending to a car accident on Route 149 in New York, called Law back and said such a taxi had just passed him.  <u>Id.</u> at 11.  A few minutes later, Law saw the taxi pull into the outlet stores' parking lot and watched a man get out.  <u>Id.</u> at 11-12.  Law recognized the man as "Kenny Trapp" because about one month earlier, Law and Miller had "dealt" with Trapp during a traffic stop of a taxi in which Trapp was a passenger.  <u>Id.</u> at 12.  In that stop, the officers found Trapp in possession of a small amount of marijuana and $1,499 in cash.  <u>Id.</u>

Law watched Trapp exit the taxi carrying "a small little bag . . . almost like a shopping bag." Hr'g Tr. at 13.  He observed Trapp go in and out of various outlet stores.  <u>Id.</u>  Law then saw a "black livery with New York City style plates" pull into the parking lot near the Polo outlet store. <u>Id.</u> at 14. The town car's front license plate was hanging down.  <u>Id.</u> at 15.  Law watched a black woman with blond hair and a bright blue hat exit the town car.  <u>Id.</u>  The woman, later identified as Danielle Goding, walked into the Polo outlet.  <u>Id.</u> at 16, 25.  Trapp also went into the Polo outlet, although Law does not remember who entered first.  <u>Id.</u> at 16.  Trapp and Goding then separately

exited the store a few minutes later.  Id. at 17.  Law observed Trapp with what appeared to be a Timberland shopping bag, which he had carried into the Polo outlet, but no longer noticed the "black bag."  Id.; see id. at 32-33.  Goding also had bags in her hand as she exited the store.  Id. at 17.

At this point, a "Tri County" taxi pulled into the parking lot.  Hr'g Tr. at 17-18.  Trapp put his bags in the trunk and got into the cab.  Id. at 18.  Law called Destito, who asked him to follow Trapp's taxi.  Id. at 19, 56.  Law followed it onto Route 9, Route 149, and then Route 4 into Vermont.  Id. at 18-19.  Destito had also given Law Vermont State Trooper Andrew Todd's cell phone number.  Id. at 19.  Destito had called Todd shortly before 5 p.m. on April 23, 2013, and told him he was working on an "ongoing drug investigation" and "wanted to coordinate" Todd with a New York State Trooper "in terms of a vehicle that was coming en route to Vermont" after "something that took place in Lake George, New York."  Id. at 64, 65 (quoting Todd's testimony).

Law called Todd and advised him of his location.  Hr'g Tr. at 19.   According to Todd, the "gist" of what Law told him was that a drug transaction had taken place near the outlets and the person involved was in a taxi en route to Vermont.  Id. at 90.  Todd was sitting in his car just east of the New York state line on Route 4 in Vermont when the taxi drove by.  Id. at 65-66.  When Law saw Todd's cruiser enter the highway, he made a U-turn and headed back to New York.  Id. at 20.  Todd observed the taxi make "several violations" -- speeding, illegal lane change, failure to use directional signals, and tailgating -- before pulling it over.  Id at 66.  He told the taxi driver about the moving violations and his "general" concerns about the connection between interstate taxi travel and drug trafficking.  Id. at 67.  The driver then consented to a search of the taxi "as well as his property and person."  Id.

Next, Todd told the passenger in the taxi, Kenneth Trapp, about the impending vehicle search (based on the driver's consent) and asked him to exit the taxi. Hr'g Tr. at 67. Trapp complied. Id. Todd informed Trapp that a K-9 unit, which had arrived moments after Todd pulled the taxi over, would also conduct a search. Id. at 69, 93. Todd asked Trapp for consent to search his shopping bags in the trunk, but Trapp refused. Id. at 69, 71. Todd did an initial search of the taxi -- not including Trapp's bags -- and then the K-9 unit followed. Id. at 70. The drug dog, Maximus, id. at 93, hopped inside the taxi to sniff around at the handler's instruction. See id. at 71 ("I know [the handler] made the dog, that he searched the inside of the vehicle, I'm not sure if exactly he did the search of the outside of the car." (quoting Trooper Todd)). Todd did not find any contraband but Maximus "alerted to the presence of narcotics both where Mr. Trapp [had been] sitting and where his property was in the trunk." Id. at 71-72. Based on Maximus' alert, Todd detained Trapp, seized his shopping bags, then applied for and received a warrant to search Trapp's belongings. Id. at 72-73; Gov't Ex. 4. Todd later uncovered 1,200 bags of heroin in Trapp's bags. Hr'g. Tr. at 73.

Meanwhile, Trooper Miller had arrived to assist Law in his surveillance at the outlets. Hr'g Tr. at 105. After observing Danielle Goding get back into the black town car outside the Polo outlet, Miller followed the car onto Route 9 and then southbound on I-87. Id. at 105-106. Law, who was then following the taxi carrying Trapp into Vermont, had "advised [Miller] to make a car stop . . . if he could" on the black town car carrying Goding. Id. at 20. Both Law and Miller had observed, back at the outlets, that the black town car's front license plate was secured by one screw and was hanging down at an angle. Id. at 15, 118, 119. Law had also informed Miller, to some extent, of his previous surveillance of Goding and Trapp at the Polo outlet and suspicions of drug activity. Id. at 20, 105-06.

4

Miller then pulled over the black town car based on its unsecured license plate.  Hr'g Tr. at 107.  During his conversation with the driver, Miller smelled burnt marijuana in the vehicle and asked both the driver and the female passenger, Goding, to exit the car.  Id. at 108.  Based on the marijuana odor, Miller believed he had probable cause to search the car and its contents.  Id. at 109.  Inside a plastic bag in the backseat, Miller found a watch box containing approximately $14,000 in cash.  Id. at 110, 128.  Goding told Miller the money was hers, she worked as a baker, and that she had come up to the outlets to shop.  Id. at 111.  He did not believe this story because she had a Polo outlet job application with her and also wore "very long press-on" nails that "looked like they just recently had been painted."  Id.  Miller did not find any evidence of marijuana after searching the town car.  Id. at 120.

After finding the money, Miller contacted Law and told him about the marijuana odor and cash.  Hr'g Tr. at 21.  The police then transported both the driver and Goding back to the Queensbury, New York, barracks.  Id. at 21, 112, 121.  Because the marijuana odor was still present at the barracks, Miller requested that a female officer search Goding.  Id. at 112.  The officer found marijuana on Goding's person.  Id. at 112, 124.  Miller issued Goding an appearance ticket for unlawful marijuana possession, which she later pled guilty to in New York state court and paid a fine.  Id. at 112, 23-24.  Miller also received a "supporting deposition" from the driver of the town car.  Id. at 113; Gov't Ex. 2.  In it, the driver admitted he knew the license plate had been hanging by one screw.  Gov't Ex. 2.  According to the driver, Goding paid him $500 in cash to drive to the Lake George outlets that morning.  Id.  The driver stated Goding had paid him to drive to the outlets three or four other times in the past.  Id.

Goding was then detained in a locked interview room at the request of Agent Destito, who was en route to the barracks with Drug Enforcement Agency ("DEA") Special Agent Thomas

Doud.  Hr'g Tr. at 24-25, 35-36.  Before they arrived, Law asked Goding some preliminary questions and did not believe her answers.  Id. at 37-38.  Goding thought Law was kidding when he told her there was a federal investigation.  Id. at 38.  According to Law, Goding "basically said that 'I don't believe you and I'm not -- I don't want to talk to you anymore.'"  Id.  Law told Destito and Doud about the topic of his interview with Goding when they arrived approximately two and a half hours later.  Id. at 38-39.  It was Law's own decision not to advise Goding of her Miranda rights during his interview with her.  Id. at 130.  He chose not to do so because he was not "asking about the marijuana which she was under arrest for[;] [he] was just asking about the money she had in her possession."  Id. at 57.

Destito and Doud arrived at the barracks around 9 p.m. and were given Goding's personal belongings, including her cell phone.  Hr'g Tr. at 133.  According to Destito, Law told him Goding had given inconsistent or not credible answers regarding the origin of the money, but Law did not specifically tell him that Goding had said she did not want to speak to Law further.  Id. at 138-139, 142.  Doud verbally advised Goding of her Miranda rights and she agreed to speak with them.  Id. at 134, 140.  Destito believed he had probable cause to arrest Goding.  Id. at 135.  The agents tried to look at her phone, but it was password-protected and Goding declined to give them her password.  Id. at 134-135.  After the interview, in which Goding said she would not admit she was involved in transporting drugs because she was afraid of being killed, Goding and Trapp, who also incriminated himself in an interview before stating he did not want to speak further, were both transported to Vermont for their appearance in federal court the next day in Burlington.  Id. at 139; see Doc. 1-1 at 5, 7 (affidavit of Agent Doud).  Destito gave Goding's phone to another agent in the Burlington FBI office and, two weeks later, that agent circumvented the password and downloaded the contents of the phone.  Id. at 135-136.

III.   <u>Discussion</u>

The initial burden of production and persuasion generally rests upon the defendant at a suppression hearing.  <u>United States v. Arboleda</u>, 633 F.2d 985, 989 (2d Cir. 1980).  "The defendant must present a <u>prima</u> <u>facie</u> case showing a Fourth Amendment violation, <u>i.e.</u>, that a government official, acting without a warrant, subjected her to either an arrest or a search and seizure."  <u>United States v. Bayless</u>, 921 F. Supp. 211, 213 (S.D.N.Y. 1996) (citing cases), <u>aff'd</u>, 201 F.3d 116 (2d Cir. 2000).  "[O]nce [the defendant] establishes a basis for his motion, the burden rests upon the [g]overnment to prove, by a preponderance of the evidence, the legality of the actions of its officers."  <u>United States v. Wyche</u>, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004).  "Thus, '[w]hen [the government] has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted.'"  <u>Bayless</u>, 921 F. Supp. at 213 (quoting <u>United States v. Bonilla Romero</u>, 836 F.2d 39, 45 (1st Cir. 1987).

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  This protection extends to vehicle stops.  <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996).  Probable cause or reasonable suspicion of a traffic violation, even a minor one, provides a sufficient basis under the Fourth Amendment for a law enforcement officer to make a traffic stop.  <u>United States v. Stewart</u>, 551 F.3d 187, 191 (2d Cir. 2009).  A law enforcement officer may also "briefly detain a person if the officer has a reasonable suspicion 'that criminal activity may be afoot.'"  <u>United States v. Bayless</u>, 201 F.3d 116, 132 (2d Cir. 2000) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)).  Reasonable suspicion should be based on specific and articulable facts objectively indicating unlawful conduct.  <u>Id.</u> at 132-33 (internal citations omitted).  The Court considers the totality of the circumstances and evaluates

those circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." Id. at 133 (internal citations omitted).

Under the automobile exception to the Fourth Amendment warrant requirement, police may also conduct a warrantless search of a vehicle if probable cause exists to believe it contains contraband or other evidence of a crime. United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (internal citations omitted). This may include containers within the vehicle. California v. Acevedo, 500 U.S. 565, 580 (1991). Probable cause exists if the facts and circumstances are sufficient to lead a person of reasonable caution to believe evidence of a crime will be found in the place searched. Gaskin, 364 F.3d at 456-57 (internal citation omitted). "[C]ourts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." Id. at 457 (internal citation omitted). Certainty is not required; the police only need a fair probability that contraband or evidence of a crime will be found. Id. (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).

If a traffic stop is lawful, "passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle." Mollica v. Volker, 229 F.3d 366, 369 (2d Cir. 2000). Thus, the police may order both passengers and driver out of a lawfully stopped car as a "matter of course." Maryland v. Wilson, 519 U.S. 408, 410 (1997). This includes a taxicab. See United States v. Gaines, 457 F.3d 238, 243 (2d Cir. 2006) ("[I]f the stop was reasonable, [the officer] was authorized to order [the passenger in the back seat] to get out of the cab." (citing Wilson, 519 U.S. at 415)). Non-owner passengers in a vehicle generally do not have a reasonable expectation of privacy in the vehicle. Rakas v. Illinois, 439 U.S. 128, 148-49 (1978); see United States v. Paulino, 850 F.2d 93, 97 (2d Cir. 1988). Accordingly, a passenger does not have a reasonable expectation of privacy in a cab's trunk, but may hold one as to personal property -- bags, for example -- within that

8

trunk.  United States v. Perea, 986 F.2d 633, 639, 642 (2d Cir. 1993); see Bond v. United States, 529

U.S. 334, 338-39 (2000) (holding that bus passenger has reasonable expectation of privacy in

luggage).

　　During a traffic stop, the police may ordinarily use "a well-trained narcotics-detection dog"

outside a lawfully stopped car without implicating "legitimate privacy interests."  Illinois v. Caballes,

543 U.S. 405, 409 (2005).  In other words, an exterior sniff is not a search, see id., and the police

need not first obtain consent or establish probable cause.  An interior sniff is different.  Although

the Second Circuit appears not to have directly addressed it, other circuits have found a drug dog's

entrance into a car's interior implicates the Fourth Amendment unless he instinctively jumps inside

without prompting from his handler.  See United States v. Pierce, 622 F.3d 209, 212-14 (3d Cir.

2010) (citing cases); United States v. Sharp, 689 F.3d 616, 620 (6th Cir. 2012) (same).  Of course, like

any search, a driver may consent to an interior sniff.  Schneckloth v. Bustamonte, 412 U.S. 218, 219

(1973) (noting that consent is a well-established exception to the "requirements of both a warrant

and probable cause"); see United States v. Chin, 5:13-cr-28, 2013 WL 5406239, at *3 (D. Vt. Sept.

26, 2013) (driver consents to drug dog's sniff inside vehicle).  And, as long as the dog is reliable, his

alert establishes probable cause to search.  Florida v. Harris, 133 S. Ct. 1050, 1057 (2013).

　　A.　　Trapp's Motion to Suppress

　　　　1.　　The Exit Order

　　Trapp does not contest the constitutionality of the initial traffic stop, and the facts indicate

Trooper Todd properly had reasonable suspicion to pull over the taxi based on the motor vehicle

violations.  See Hr'g Tr. at 66; Stewart, 551 F.3d at 191.  Trapp instead argues "Todd's exit order of

the Defendant, a paying taxicab customer, was an illegal seizure of the Defendant" under the Fourth

Amendment.  (Doc. 61 at 1.)  In doing so, he cites Massachusetts state court decisions for the

proposition that such an "exit order" is justified only when an officer reasonably believes the safety of police or others may be in danger.  See id. at 1-2; Commonwealth v. Vazquez, 426 Mass. 99, 102-03 (1997) ("To justify . . . the order to the occupants to exit the automobile, we ask whether a reasonably prudent man in the policeman's position would be warranted in the belief that the safety of the police or that of other persons was in danger." (internal quotation marks and citations omitted)).  Trapp contends that because Todd "had absolutely no safety concerns" and "Trapp was never told he did not have to exit the vehicle," the heroin must be suppressed under the Supreme Court's fruit of the poisonous tree analysis in Wong Sun v. United States, 371 U.S. 471 (1963). (Doc. 61 at 2-3.)

Trapp, however, is in federal court, not Massachusetts state court.  As noted above, the United States Supreme Court in Wilson held that "as a matter of course," the police may order a passenger out of a lawfully stopped vehicle.  519 U.S. at 410; see Mollica, 229 F.3d at 369 (no Fourth Amendment interest in not exiting vehicle).  This includes taxicab passengers.  Gaines, 457 F.3d at 243.  The Court's holding in Wilson extended Pennsylvania v. Mimms, 434 U.S. 106 (1977), which had applied only to drivers.  That the Massachusetts Supreme Judicial Court did not adopt Mimms or Wilson on state constitutional law grounds does not mean this Court is free do the same.  See Commonwealth v. Gonsalves, 429 Mass. 658, 661-62 (1999) (noting that Massachusetts has "not adopted Mimms" and thus "depart[s] from the Federal view of a citizen's Fourth Amendment rights in the area" because its own "long-standing rule expresses a principle of State constitutional law"). Trapp has no Fourth Amendment interest in not being asked to exit the taxi.

2.     Reasonable Expectation of Privacy in a Taxicab

Next, Trapp claims the drug dog's sniff of the taxi was unconstitutional because "the taxicab passenger enjoys an expectation of privacy" and the sniff was not supported by probable cause.

(Doc. 44 at 8.)  He bases this argument on dicta in <u>Katz v. United States</u>, where the Court stated that "[n]o less than an individual . . . in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment."  389 U.S. 347, 352 (1967).  Trapp also relies on the dissent in <u>United States v. Woodrum</u>, 208 F.3d 8 (1st Cir. 2000), where three dissenting judges in the First Circuit argue "[t]here is in fact a reasonable expectation of privacy by the passenger in a cab." <u>Id.</u> at 12 (Lynch, J., dissenting).  In the context of qualified immunity, the Second Circuit has stated that "it is an open question whether [a passenger has] a clearly established expectation of privacy in the passenger area of the taxicab in which he was riding."  <u>Townes v. City of New York</u>, 176 F.3d 138, 144 n.2 (2d Cir. 1999).  Similarly, district courts within the Second Circuit "have disagreed as to whether taxicab passengers have a reasonable expectation of privacy in the interior of a cab in which they are travelling."  <u>United States v. Bulluck</u>, 09-cr-652-pgg, 2010 WL 1948591, at *13 (S.D.N.Y. May 13, 2010) (citing cases) (holding no such expectation exists).[2]  Trapp uses the <u>Katz</u> dicta and <u>Woodrum</u> dissent to argue the cab was a "constitutionally protected area."  (Doc. 44 at 8.)  Thus, he claims, the dog's sniff of the cab constituted a search unsupported by probable cause and without his consent.[3]  <u>Id.</u>

As noted above, an exterior sniff is not a search and does not trigger Fourth Amendment protection unless it unreasonably prolongs a traffic stop.  <u>Caballes</u>, 543 U.S. at 407.  Trapp does not argue the duration of the stop was unreasonable, and there was no indication it was.  It is unclear

---

[2] On February 24, 2014, the Second Circuit remanded <u>Bulluck</u> in a summary order based on a finding of ineffective assistance of counsel.  <u>United States v. Bulluck</u>, 13-255, 2014 WL 684992 (2d Cir. Feb. 24, 2014).  The court did not reach the issue of whether a passenger has a reasonable expectation of privacy in the rear seat area of a taxi, but noted that "the district court accurately determined [this legal issue] has not been addressed by this Court or the United States Supreme Court."  <u>Id.</u> at *1.

[3] Based on this logic, Todd's initial search of the interior of the cab would also have needed probable cause or Trapp's consent.

Maximus even conducted an exterior sniff of the cab.  Hr'g Tr. at 71.  The handler did "ma[k]e" Maximus sniff inside the cab, however, and he alerted on the seat where Trapp had been sitting.  Id. Todd recounted both alerts -- at Trapp's bags in the trunk and on the rear passenger seat -- in the affidavit accompanying his search warrant application.  Gov't Ex. 4 at 4.  Only Maximus' interior sniff could present Fourth Amendment concerns in this case, see Pierce, 622 F.3d at 214, and only if Trapp had a reasonable expectation of privacy inside the cab.

The Court finds Trapp had no such expectation.  Contrary to his claims, the Supreme Court has not held a taxicab passenger has a reasonable expectation of privacy inside a cab.  See Bulluck, 2014 WL 684992, at *2 ("[N]o binding precedent from [the Second Circuit] or the Supreme Court has established that a taxi passenger has an expectation of privacy in the rear portion of the cab in which the passenger is traveling.").  Trapp makes much of the above-mentioned dicta in Katz.  In a post-Katz case, however, the Supreme Court points out that the decision it cited in Katz -- that purportedly supports extending Fourth Amendment protection to a taxicab passenger -- did not actually address the issue.  Rakas v. Illinois, 439 U.S. 128, 149 n.16 (1978) ("The dissent states that Katz v. United States expressly recognized protection for passengers of taxicabs and asks why that protection should not also extend to these petitioners.  Katz relied on Rios v. United States, 364 U.S. 253 [] (1960), as support for that proposition.  The question of Rios' right to contest the search was not presented to or addressed by the Court . . . .").  The Court agrees with the analysis of this issue in Bulluck, 2010 WL 1948591, at *9-22, which held that, as with privately-owned vehicles,

the passenger in a taxi has no reasonable expectation of privacy.  Id. at *22.[4]  Because Trapp had no

expectation, Maximus could properly sniff inside the cab based on the driver's consent.

And even assuming he did, Trapp had no such expectation in the trunk.  See Perea, 986 F.2d

at 639 (holding that defendant taxicab passenger "could have no reasonable expectation of privacy

in the [cab's] trunk").  The taxi driver unambiguously gave both verbal and written consent for Todd

and a K-9 unit to search the cab, making probable cause or a warrant unnecessary.  Hr'g Tr. at 67;

Gov't Ex. 6 (video of traffic stop); see Schneckloth, 412 U.S. at 219.  Maximus' sniff of Trapp's

shopping bags in the trunk (in which Trapp did have a privacy interest) was not a search of those

bags.  See United States v. Place, 462 U.S. 696, 707 (1983); United States v. Hayes, 551 F.3d 138,

144 (2d Cir. 2008).  After Maximus alerted to the possible presence of narcotics in Trapp's bags, the

police had probable cause to search them without a warrant.  Acevedo, 500 U.S. at 580; see Harris,

133 S. Ct. at 1057 ("If a bona fide organization has certified a dog after testing his reliability in a

---

[4]  In particular, the district court in Bulluck illustrates the practical difficulties of finding a
passenger has a reasonable expectation of privacy inside a cab:

> Finding that such an expectation of privacy exists would also raise difficult questions
> about what portions of the cab are in fact private.  It seems clear that a taxicab
> passenger has no reasonable expectation of privacy with respect to the trunk, Perea,
> 986 F.2d at 639, and the glove compartment of the vehicle, Rakas, 439 U.S. at
> 148-49, but to what extent does a passenger have an expectation of privacy as to the
> interior of the cab?  Does that expectation extend merely to the seat the passenger
> happens to be sitting in, to the passenger's seat and the area in front of or under that
> seat, to the entire rear compartment, to the entire rear compartment and the area
> under the entire front seat, to the front compartment as well?  Does the analysis
> change depending on where the passenger is sitting?  In other words, does a
> passenger sitting next to the driver have no expectation of privacy concerning the
> rear seat area?  Does the analysis change depending on whether there is a partial or
> complete partition between the driver and the passenger?  Finding that a taxicab
> passenger has a reasonable expectation of privacy will lead to arbitrary
> determinations of what space in the cab is in fact private.

Id. at *22.

controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").  Todd nevertheless applied for and received a warrant based on Maximus' alerts, leading to the discovery of heroin.[5]  Hr'g. Tr. at 72-74; Gov't Ex. 4.

### 3.  The Validity of the Warrant

Finally, Trapp claims the search warrant was invalid because Trooper Todd's affidavit failed to provide any information about Maximus' reliability.  (Doc. 44 at 9 n.1.)  "A judge's probable-cause determination is not overly strict."  United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005). When "[p]resented with a warrant application, the judge must "simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, [. . .] there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983) (emphases removed)).  "[A] court reviewing a challenged warrant -- whether at the district or appellate level -- "must accord considerable deference to the probable cause determination of the issuing magistrate."  United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011) (quoting Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007)).  The fact that a judge found probable cause "is itself a substantial factor tending to uphold the validity of the warrant" and "in a close case any doubts should be resolved in favor of upholding" it.  United States v. Jackstadt, 617 F.2d 12, 13-14 (2d Cir. 1980).  "[T]he task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination."  Clark, 638 F.3d at 93 (quoting Gates, 462 U.S. at 238).

---

[5]  Because it finds Trapp had no reasonable expectation of privacy inside the cab, the Court need not address the government's argument that under the imputed knowledge doctrine, the police had probable cause to search the taxi and Trapp's belongings even without the cab driver's consent. See Doc. 48 at 8 n.1.

Trooper Todd's affidavit provides that "Corporal Kerber and K9 Maximus are a narcotic detection team trained and certified by the Vermont Criminal Justice Training Council in the detection of narcotics."  Gov't Ex. 4 at 4.  Trapp argues "[m]erely stating that a dog is 'certified' is not enough" and then quotes over a page of Justice Souter's dissent in Caballes, 543 U.S. at 411-412. (Doc. 44 at 9-10.)  Trapp does not, however, cite a case holding that mere declaration of certification is insufficient.  One case he quotes, but does not cite, United States v. Grupee, 682 F.3d 143 (1st Cir. 2012) (Souter, J.), examines this issue and holds the opposite of what Trapp claims.  In response to the argument that a trooper's supporting affidavit to a warrant -- which provided only that a state police "drug detection K-9 . . . alerted" outside the defendant's car -- was insufficient to inform the magistrate about the dog's reliability, Justice Souter stated:

> The reasonableness of relying on the behavior of a police dog depends on what one knows about the dog and the person who handles it, see United States v. Race, 529 F.2d 12, 14 (1st Cir. 1976); United States v. Berry, 90 F.3d 148, 153 (6th Cir. 1996), and the police can provide this sort of information in a readily available résumé of general certification standards and particular performance statistics, dog by dog, to be attached to a warrant application on a moment's notice.  Here, in contrast, the magistrate was told only that a dog was used by the Massachusetts State Police to sniff out narcotics.

> But parsimonious though this disclosure was, we think it passes muster under existing circuit precedent on searches authorized by warrant, which holds that describing a drug detection dog as "trained" and in the company of a drug detection agent is sufficient to allow a magistrate "reasonably [to] infer" that a trained law enforcement dog has "attained a high degree of proficiency in detecting the scent of narcotics."

Id. at 147 (citations omitted).  Other district courts in the Second Circuit have not found differently. See, e.g., United States v. Rivera, 3:07-cr-285-ebb, 2008 WL 2229917, at *5 n.1 (D. Conn. May 28, 2008), aff'd, 353 F. App'x 535 (2d Cir. 2009) ("Thus far, the Second Circuit does not seem to have held that evidence of a drug-sniffing dog's reliability must be introduced before the government may rely on the dog's alert to establish probable cause."); United States v. Dillon, 810 F. Supp. 57, 61

(W.D.N.Y. 1992) ("[T]he canine sniffing technique 'is now sufficiently well-established to make a formal recitation of a police dog's <u>curriculum vitae</u> unnecessary in the context of ordinary warrant applications . . . .'" (quoting <u>United States v. Watson</u>, 551 F. Supp. 1123, 1127 (D.D.C. 1982))).

Trooper Todd's description of Maximus provided even more information than the affidavit in <u>Grupee</u>, including the name of the dog's handler and the organization that certified the pair as a narcotics detection team.  Moreover, the Supreme Court recently addressed the reliability of dog alerts in <u>Florida v. Harris</u>, 133 S. Ct. 1050 (2013), where it stated that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  <u>Id.</u> at 1057.  The Court held that "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  <u>Id.</u>  Trapp claims <u>Harris</u> is "inapposite" to the present circumstances because "the dog's history was ascertained by the fact finder" in that case but here, "[t]his Court is confined to reviewing the four corners of the search warrant."  (Doc. 44 at 9 n.1.)

No additional information about Maximus' reliability is required to uphold the search warrant.  The Vermont Criminal Justice Training Council certified Maximus and his handler in the detection of narcotics; this is enough for the issuing judge to have reasonably inferred Maximus' "skills were not those of an ordinary housepet."[6]  <u>Watson</u>, 551 F.Supp. at 1127; <u>see</u> <u>United States v. Mikelic</u>, 3:10-cr-132-cfd, 2011 WL 4368565, at *5 (D. Conn. Sept. 19, 2011) (finding that officer's affidavit, which only stated dog was "trained in the detection of illegal drugs . . . was sufficient for purposes of establishing the reliability of the dog 'sniff' evidence." (internal quotation marks and

---

[6] Trapp does not argue Maximus was in fact <u>not</u> certified or reliable, but that mere declaration of certification is insufficient.  (Doc. 44 at 9.)

citation omitted)).  The affidavit's declaration of certification "itself provide[d] sufficient reason" for the Vermont state court judge to trust Maximus' alert.  Harris, 133 S. Ct. at 1057.  Accordingly, the judge had a "substantial basis" for finding probable cause.  Clark, 638 F.3d at 93; see Gates, 462 U.S. at 238.  Finally, even if the warrant were invalid, "the exclusionary rule barring illegally obtained evidence from the courtroom does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge."  United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)).  None of the four circumstances in which the good faith exception does not apply, see Leon, 468 U.S. at 923, are present here.

Trapp's motion to suppress is therefore denied.

B.     Goding's Motion to Suppress

1.     The Initial Stop

Goding first claims that because the government only introduced evidence indicating the license plate was "hanging" or "dangling" by one screw (Hr'g Tr. at 15, 118, 119), but not "actually swinging" (Doc. 67 at 5), it has failed to prove reasonable suspicion of a traffic violation.  In other words, Goding contends there is no evidence to suggest the license plate was not, in fact, secured by that single screw.  This argument is based on the text of New York Vehicle and Traffic Law § 402(1)(a), which requires a license plate to be "securely fastened so as to prevent [it] from swinging."  As mentioned above, "reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop."  Stewart, 551 F.3d at 193.  Reasonable suspicion must be "based on specific and articulable facts" indicating "unlawful conduct."  Bayless, 201 F.3d at 132-33 (internal quotation marks and citation omitted).  "Whether reasonable suspicion exists is measured from the objective perspective of a trained and

experienced law enforcement officer."  United States v. Williams, 11-cr-228, 2011 WL 5843475, at

*3 (S.D.N.Y. Nov. 21, 2011) (citations omitted).  The government has the burden of proving

reasonable suspicion by a preponderance of the evidence.  Id.

 The government has met that burden here.  Based on the evidence presented, Miller

"observed sufficient facts to support objectively reasonable suspicion," id. at *4, that the license

plate -- "hanging" or "dangling" at an angle and attached by only one screw -- was not "securely

fastened so as to prevent [it] from swinging."  § 402(1)(a).  Even if the license plate were, in truth,

securely fastened at that angle by that single screw, Miller had reasonable suspicion to believe it was

not.  In all likelihood, it either slipped, fell, was knocked into, or otherwise "sw[u]ng[]" into that

position.  Id.  That Miller did not actually see the license plate "swinging in the breeze," Hr'g Tr. at

31, does not undermine his reasonable suspicion, based on observing it attached by one screw at an

angle, that it was not fastened "so as to prevent" it from doing so.  § 402(1)(a).  In any event, a

mistake of fact does not negate the constitutionality of a traffic stop.  See United States v. Jenkins,

452 F.3d 207, 212 (2d Cir. 2006) ("The constitutional validity of a stop is not undermined simply

because the officers who made the stop were mistaken about relevant facts.").  The New York state

cases Goding cites are inapposite.  The police officers in those cases mistakenly believed § 402(1)(a)

required bolting a license plate to a vehicle with screws, instead of using a twist tie or wire.

See People v. Baez, 501 N.Y.S.2d 550 (Crim. Ct. 1986) (officer "testified that he observed that the

rear license plate of the vehicle was 'wired,' which he believed not to be in accordance with the

Vehicle and Traffic Law."); People v. Garcia, 647 N.Y.S.2d 355, 360 (Cnty. Ct. 1996) (officer

testified that "[t]he license plate on the rear of the vehicle was on only by a twist tie, and usually is

put on by screws.  That is a violation of the New York State Vehicle and Traffic law.").  Goding

correctly points out that a "mistake of law cannot provide objectively reasonable grounds for suspicion," but here there was no such mistake.  Williams, 2011 WL 5843475, at *3.

> 2.    The Search of the Vehicle

Goding next claims Miller lacked probable cause to search the town car.  (Doc. 67 at 6.)  Miller testified he smelled marijuana in the vehicle.  Hr'g Tr. at 108.  Specifically, Goding argues that (1) taxicabs emanate all sorts of smells from previous passengers and (2) because Miller did not find marijuana in his roadside search, his suspicion -- i.e., probable cause -- was "dispelled."  (Doc. 67 at 7.)  As mentioned above, probable cause exists if the facts and circumstances are sufficient to lead a person of reasonable caution to believe evidence of a crime will be found in the place searched.  Gaskin, 364 F.3d at 456-57 (internal citation omitted).  The smell of marijuana provides probable cause to search a vehicle.  See United States v. Mitchell, 11-cr-6019, 2012 WL 6827387, at *7 (W.D.N.Y. Nov. 27, 2012) (citing cases), report and recommendation adopted, 11-cr-6019L, 2013 WL 132459 (W.D.N.Y. Jan. 9, 2013).  Goding does not cite any case exempting taxicabs from this rule, and the Court has found none.  Moreover, Miller's sense of smell was accurate -- his suspicion was eventually confirmed, not dispelled.  A female officer searched Goding more thoroughly at the police barracks and found marijuana in her underwear.  Hr'g Tr. at 112; Doc. 67 at 12.  Goding later pleaded guilty to marijuana possession in New York state court.  Hr'g Tr. at 23.  Miller had probable cause to search the vehicle and its contents.

> 3.    The Arrest

Goding also briefly argues the police did not have probable cause to arrest her.  (Doc. 67 at 6; Doc. 45 at 6.)  Probable cause to arrest exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a

crime." <u>Gonzalez v. City of Schenectady</u>, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation marks and citation omitted) (emphasis removed).  Under the collective knowledge doctrine, "information known to law enforcement officials other than the arresting or searching officer can form the basis for probable cause."  <u>United States v. Mayberry</u>, 2:12-cr-153, 2013 WL 3560968, at *6 (D. Vt. July 11, 2013) (citing <u>United States v. Colon</u>, 250 F.3d 130, 135 (2d Cir. 2001).

The smell of marijuana justified continued detention of the town car and its occupants. <u>Jenkins</u>, 452 F.3d at 214.  Once the police discovered marijuana on Goding's person at the barracks, they had probable cause to arrest Goding for unlawful possession.  And, under the collective knowledge doctrine, law enforcement also "possess[ed] sufficient information to permit the conclusion that" detaining and later arresting Goding was justified based on (1) information the FBI and DEA obtained from an informant, (2) the surveillance of Trapp and Goding at the outlets, (3) the discovery of the $14,000 in Goding's belongings, and (4) her inconsistent or non-credible explanations about the money.  <u>Colon</u>, 250 F.3d at 136.  Based on the informant's tip, FBI Agent Destito and DEA Agent Doud knew Trapp might be traveling to the Lake George outlets to possibly make a drug deal.  (Doc. 1-1 at 3) (affidavit of Agent Doud).  According to the informant, Trapp often traveled to the outlets "to meet with individuals from Brooklyn to give them cash from his heroin sales and obtain more heroin from them," and one of the heroin couriers was a female. <u>Id.</u> at 2.  After setting up surveillance at the outlets, Investigator Law observed the "black livery with New York City style plates" arrive.  Hr'g Tr. at 14.  Goding exited the town car with bags and walked into the store Trapp was in.  They exited separately and then left the outlets in taxicabs. After Miller pulled over the town car and conducted a probable cause search based on the smell of marijuana, he discovered approximately $14,000 in cash, which Goding stated was hers.  Hr'g. Tr. at 22, 111.  The Court finds Goding gave non-credible answers as to the origin of the money.  <u>See</u>

id. at 111.  Based on all of the above, law enforcement collectively had knowledge "sufficient to

warrant a person of reasonable caution in the belief that" Goding had been involved in a drug deal

with Trapp at the outlets.  Gonzalez, 728 F.3d at 155.

        4.      The Cell Phone Search

Goding also challenges the search of her cell phone, which occurred approximately two

weeks after her arrest.  Hr'g Tr. at 136.  The government relies on the search incident to arrest

exception to the warrant requirement, under which the police may conduct a warrantless search of a

lawfully arrested person, her belongings (including containers), and the area within her control.

United States v. Robinson, 414 U.S. 218, 224 (1973).  In her motion, Goding cites United States v.

Wurie, 728 F.3d 1 (1st Cir. 2013), in which the First Circuit held that searching a cell phone pursuant

to a lawful arrest "exceeds the boundaries of the Fourth Amendment search-incident-to-arrest

exception."  728 F.3d at 1.  In November 2013, this Court similarly held that "cell phones properly

seized pursuant to the search-incident-to-arrest exception or the automobile exception cannot be

searched without a warrant."  United States v. Mayo, 2:13-cr-48-wks, 2013 WL 5945802, at *13

(D. Vt. Nov. 6, 2013); see United States v. DiMarco, 12-cr-205-rpp, 2013 WL 444764, at *10

(S.D.N.Y. Feb. 5, 2013) (holding the search of defendant's cell phone six hours after arrest did not

fall within search incident to arrest exception).  The Supreme Court has granted certiorari to address

the issue in Wurie and a similar case, People v. Riley, D059840, 2013 WL 475242 (Cal. Ct. App. Feb.

8, 2013), and oral arguments are scheduled for April 29, 2014.  See Doc. 68 at 3 n.1.

For substantially the same reasons articulated in Mayo, the Court finds the search incident to

arrest exception inapplicable in this circumstance.  See Mayo, 2013 WL 5945802, at *9 (concluding

"it is simply inappropriate to analogize [modern] cell phones to cigarette packs, purses, and address

books; the more apt comparison is to computers.").  Accordingly, Goding's Fourth Amendment

rights were violated when the FBI searched her phone, without a warrant, two weeks after her arrest.[7]  As in Mayo, however, the Court finds application of the exclusionary rule unwarranted because the FBI acted with a reasonable good-faith belief that a warrant was not required.  See id. at 14 (citing Davis v. United States, 131 S. Ct. 2419, 2428 (2011)).  Indeed, at the time of the search, "all of the circuits to address the issue had permitted" cell phone searches incident to arrest.  Mayo, 2013 WL 5945802, at *15.  Wurie was not decided until May 17, 2013, see Doc. 49 at 12, and the Second Circuit has not directly addressed the issue.[8]  "Law enforcement in this case was acting pursuant to reasonable reading of Supreme Court precedent and a general consensus in other circuits."  Mayo, 2013 WL 5945802, at *14.  The good-faith exception therefore applies.

5.     Miranda Warnings

Goding first seeks to suppress the statements she made to Investigator Law in the initial interrogation. (Doc. 67 at 14.)  Law testified that at the end of his questioning of Goding, which lasted five to ten minutes and concerned the origin of the $14,000, she "basically said that 'I don't believe you and I'm not -- I don't want to talk to you anymore.'"  Hr'g. Tr. at 38.  In other words, Goding exercised her "right to cut off questioning" -- even though Law had not given Miranda warnings.  Miranda v. Arizona, 384 U.S. 436, 444-45, 474 (1966); see Campaneria v. Reid, 891 F.2d 1014, 1017, 1021 (2d Cir. 1989) (finding that "[n]othing was ambiguous or equivocal" when the

---

[7]  The seizure of her cell phone pursuant to arrest, of course, was valid if the FBI had probable cause to believe it contained evidence that could be destroyed.  See id. at *13 ("The item may be seized temporarily.  It does not follow, however, that the container may be opened on the spot.  Once the container is in custody, there is no risk that evidence will be destroyed.  Some inconvenience to the officer is entailed by requiring him to obtain a warrant before opening the container, but that alone does not excuse the duty to go before a neutral magistrate." (quoting Texas v. Brown, 460 U.S. 730, 749-50 (1983) (plurality) (Stevens, J., concurring))).

[8]  The Second Circuit has, however, "assum[ed] arguendo that the warrantless search of [a defendant's] cell phone violated the Fourth Amendment."  United States v. Aguiar, 737 F.3d 251, 263 (2d Cir. 2013) (concluding any error was harmless).

defendant told police, "I don't want to talk to you now."). The government, however, has indicated it does not seek to introduce any of the statements Goding made in the first interrogation, making this issue moot. (Doc. 68 at 7.) See United States v. Robinson, 833 F. Supp. 2d 406, 411 n.2 (D. Vt. 2011).

Second, Goding argues that as a result of Law's failure to give Miranda warnings and her invocation of the right to cut off questioning, all statements obtained by FBI Agent Destito and DEA Agent Doud in the second interrogation should be suppressed. (Doc. 67 at 14.) Destito testified that Doud verbally advised Goding of her Miranda rights and she agreed to speak with them. Hr'g Tr. at 134, 140. She makes two main claims: (1) the government did not scrupulously honor her request to cut off questioning, or alternatively (2) the police used a deliberate two-step interrogation strategy designed to get her to confess. (Doc. 67 at 14-15.) Goding also contends the government has not met its burden to prove she was properly given Miranda warnings or validly waived them. Id. at 14-16.

a.      The Right to Cut Off Questioning

The Supreme Court has twice addressed the admissibility of statements after a Miranda warning but obtained subsequent to an earlier unwarned statement. Oregon v. Elstad, 470 U.S. 298 (1985); Missouri v. Seibert, 542 U.S. 600 (2004). Elstad focused on the voluntariness of the pre-warning and post-warning statements. Seibert, however, shifted the focus to whether the Miranda warning was effective. The Second Circuit has held Seibert lays out an exception to Elstad for cases in which a deliberate, two-step strategy was used to obtain the post-warning confession. United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007). The Circuit applied the Carter analysis in United States v. Capers, 627 F.3d 470 (2d Cir. 2010), and affirmed the suppression of post-Miranda

statements where a deliberate two-step strategy was used and no curative measures were taken to obviate the violation.  Id.

The situation in this case is slightly different than Elstad or Seibert because, although Law failed to give Miranda warnings, Goding invoked her rights anyway.[9]  Thus, before analyzing whether the police engaged in a prohibited two-step interrogation, the Court must first determine whether the government "scrupulously honored" Goding's right not to speak to the police.  Under Michigan v. Mosley, 423 U.S. 96 (1975), "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether [her] 'right to cut off questioning' was 'scrupulously honored.'"  Id. at 102 (quoting Miranda, 384 U.S. at 474, 479).  "In making this determination, the court reviews the circumstances of the interrogation, including whether the defendant was initially advised of his Miranda rights, whether questioning immediately ceased when the defendant invoked his rights, the duration of time that passed before questioning resumed, and whether there was a change in the location of the interrogation or the identity of the interrogator."  Whyte v. Ercole, 04-cv-1287-arr, 2007 WL 2782757, at *7 (E.D.N.Y. Sept. 24, 2007) (citing Mosley, 423 U.S. at 104-06).  These factors "are not a strict test for admissibility," however, and "the Mosley Court did not intend these factors to be exhaustive, nor did it intend that a finding as to any one of the enumerated factors would forestall the more general inquiry."  United States v. Suarez, 06-cr-273-rpp, 2006 WL 3543616, at *6 (S.D.N.Y. Dec. 7, 2006) (quoting United States v. Dell'Aria, 811 F. Supp. 837, 843 (E.D.N.Y. 1993)).

---

[9]  Goding was held in a locked interview room at the police barracks and questioned about the origin of the $14,000, which Law believed was related to a narcotics transaction.  Hr'g Tr. at 131, 59.  Even though the government indicates it will not introduce Goding's statements to Law, the Court finds she was "both in custody and questioned with investigative intent" by Law and thus, "Miranda warnings were required."  Robinson, 833 F. Supp. 2d at 411.

The defendant in Mosley was arrested on suspicion of robbery.  Mosley, 423 U.S. at 97.

After being read his Miranda rights, Mosley said he "did not want to answer any questions about the

robberies" and the detective "promptly ceased the interrogation."  Id.  Here, Goding was not

advised of her Miranda rights and Law questioned her for five to ten minutes about the origin of the

$14,000.  Hr'g Tr. at 59-60.  Goding apparently gave inconsistent or non-credible answers before

saying "I don't want to talk to you anymore."  Id. at 37-38.  Law testified he stopped the

interrogation at that point -- albeit not because of her statement, but because he "needed to

continue on with some other . . . matters and try to get some paperwork done."  Hr'g Tr. at 58.

Indeed, Law apparently believed that just "because she didn't want to talk doesn't mean I didn't --

wouldn't -- couldn't sit there and talk to her some more."  Id.  The Court notes that Law's belief is

of course incorrect, see Miranda, 384 U.S. 436, but, in any event, the questioning promptly ended

(even if for the wrong reasons) and there is no indication Law "tr[ied] either to resume the

questioning or in any way to persuade [Goding] to reconsider [her] position."  Mosley, 423 U.S.

at 104.

In Mosley, "[a]fter an interval of more than two hours," a different detective (on a different

floor of the police department) again gave the defendant Miranda warnings.  Id.  The detective then

interrogated Mosley about an unrelated murder, to which he confessed.  Id. at 104-05.  The Court

found Mosley's right to cut off questioning had been "fully respected."  Id. at 104.  Here, after a

similar period of time, Destito and Doud arrived at the barracks to interview Goding about the

$14,000.  Hr'g Tr. at 129-30.  Destito testified Doud gave Goding Miranda warnings and she agreed

to speak with them.  Id. at 134.  Although the topic of the second interrogation was the same as in

the first, that factor alone is not dispositive.  See United States v. Snipe, 06-cr-1102-lbs, 2007

WL 1704182, at *4 (S.D.N.Y. June 11, 2007) ("While the parties point to no controlling Second

Circuit authority on the issue, courts in other circuits have found that the mere fact that a subsequent interrogation is on the same subject matter does not render it unconstitutional."); Santos v. Artuz, 99-cv-4614-rr, 2002 WL 718265, at *6 (E.D.N.Y. Mar. 8, 2002) (citing cases). Furthermore, although the second interrogation was in the same interview room, it was with different interrogators who were not even aware Goding had invoked her rights.  Hr'g Tr. at 138-39. Law testified he conveyed the topic of his interview to Destito and Doud, id. at 38-39, but this does not undercut Destito's testimony that Law did not specifically inform the agents Goding had invoked her right to cut off questioning.  Id. at 138-39.  Indeed, this is likely because Law (incorrectly) believed Goding had not done so.  See id. at 38.

The circumstances here are more similar to the facts in Mosley than in cases where the Second Circuit has found the police did not scrupulously honor the defendant's rights.  See Dell'Aria, 811 F. Supp. at 843 (noting the Second Circuit's willingness to find "interrogations that followed closely on the heels of a defendant's invocation of the right to silence" violate Mosley) (citing cases).  In Anderson v. Smith, 751 F.2d 96 (2d Cir. 1984), the police did not even momentarily cease questioning when the defendant said he did not want to speak to them.  See id. at 103 ("We do not see here how it can be said that [his] right of silence was 'scrupulously honored.' With [the defendant] at several points seeking to terminate the questioning, the interrogator plowed ahead.").  And in Campaneria v. Reid, 891 F.2d 1014 (2d Cir. 1989), the Circuit similarly found the police did not respect the defendant's rights when they attempted to change his mind immediately after he stated he did not wish to be questioned.  Id. at 1021-22.

Under the facts presented, the Court finds the government "scrupulously honored" Goding's right to cut off questioning.  Law ended his questioning (albeit for the wrong reasons) once Goding told him she did not want to talk, and a two and a half hour break separated the

26

interrogations.  "This is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind."  Mosley, 423 U.S. at 105-06.  Accordingly, Goding's second set of statements may be admitted if they were voluntarily made.  Elstad, 470 U.S. at 318.

> b.    The "Two-Step" Interrogation

As noted above, Goding alternatively argues the statements obtained from the second interrogation must be suppressed because the government used a prohibited two-step interrogation strategy.  See United States v. Moore, 670 F.3d 222, 227 (2d Cir. 2012) (describing the strategy as a "technique designed to subvert [a defendant's] Fifth Amendment rights by getting him to incriminate himself before being advised of his rights, then reading him his rights and getting him to incriminate himself again while still disarmed by the original incrimination.").  In Moore, the Circuit put forth a framework to guide a "two-step" analysis:

> First, was the initial statement, though voluntary, obtained in violation of the defendant's Miranda rights?  If not, there is no need to go further.  If the initial statement was obtained in violation of the defendant's Miranda rights, has the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did not engage in a deliberate two-step process calculated to undermine the defendant's Miranda rights?  If so, the defendant's post-warning statement is admissible so long as it, too, was voluntary; if not, the post-warning statement must be suppressed unless curative measures (designed to ensure that a reasonable person in the defendant's position would understand the import and effect of the Miranda warnings and waiver) were taken before the defendant's post-warning statement.

670 F.3d at 229-30.  Even though the government will not introduce them, Goding's initial statements to Law were obtained in violation of Miranda because she was subjected to custodial interrogation without first being advised of her rights.  Thus, the next question is whether the government engaged in a deliberate two-step interrogation strategy.  In Seibert, the Court identified

five (non-dispositive) factors to consider:  (1) the thoroughness of the first interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the statements, (4) the continuity of personnel who interviewed the defendant, and (5) the continuity of the questioning. Moore, 670 F.3d at 231-34 (citing Seibert).

Almost all factors favor the government here.  In Seibert, "the initial 'questioning was systematic, exhaustive, managed with psychological skill,' and left 'little, if anything, of incriminating potential . . . unsaid.'"  Moore, 670 F.3d at 231 (quoting Seibert).  Here, Law's questioning lasted five to ten minutes and at best revealed similar "inconsistent or non[-]believable statements as to the origin of the" $14,000 that Goding had already told Trooper Miller while roadside.  Hr'g. Tr. at 142; see id. at 111.  The content of Goding's two statements also did not "appreciably overlap."  Moore, 670 F.3d at 231.  Although there were similarities -- in both statements, she gave non-credible explanations about the money -- during the second interrogation, Goding stated she suspected Trapp was involved in narcotics distribution and said she would not admit she was also involved because she was afraid of being killed.  (Doc. 1-1 at 5.)  "This stands in stark contrast to the Seibert case, where the defendant gave a full confession before receiving the [Miranda] warning and then was essentially cross-examined about her confession into a tape recorder after having been given the warning."  Carter, 489 F.3d at 536; see Robinson, 833 F. Supp. 2d at 413 (first interrogation led to defendant's admission of drug possession and an involuntary consent to search).

Although both interrogations took place in the same room, they were conducted by different officers.  In Seibert and Capers -- where deliberate "two-step" interrogations were found -- the same officer conducted both interrogations.  Moore, 670 F.3d at 232.  Law testified it was his own decision not to give Goding Miranda warnings, Hr'g Tr. at 130; there is no evidence he "initiated [his] questioning as part of a two-step interrogation" on behalf of the federal agents.  Moore, 670

F.3d at 232.  Law did not even know if Destito and Doud ever arrived because he left for lacrosse

practice before they showed up.  Hr'g Tr. at 125.  And even though Law told Destito that Goding

had given inconsistent explanations about the money, Hr'g Tr. at 142, this is not a situation where

Goding had already "let the cat out of the bag" in her first interrogation.  Finally, the interrogations

took place approximately two and a half hours apart -- more than enough time for Goding "to have

reasonably believed that the second interrogation was not merely a continuation of the first."

Moore, 670 F.3d at 232; see Carter, 489 F.3d at 536 (finding sufficient a break of "over an hour").

Based on the totality of the circumstances, the government has satisfied its burden to demonstrate it

did not intentionally engage in a "deliberate two-step process calculated to undermine the

defendant's Miranda rights."  Moore, 670 F.3d at 230.  This case is therefore controlled by Elstad,

not Seibert, and "the dispositive inquiry is whether the statements were provided voluntarily and

free of coercion."  Id. at 233 (citing Elstad, 470 U.S. at 318).

c.     Receipt and Waiver of Miranda Rights

Nothing in the record casts doubt on Agent Destito's testimony that Agent Doud verbally

advised Goding of her Miranda rights and she agreed to speak with them.  Goding argues "the

government failed to elicit testimony that would meet its burden" to demonstrate she received

Miranda warnings and validly waived them.  (Doc. 67 at 14.)  "[T]he government bears the burden

of establishing by a preponderance of the evidence that law enforcement officers properly advised

an accused of her Fifth Amendment rights and that she made a knowing and voluntary waiver of

those rights."  Robinson, 833 F. Supp. 2d at 412.

Here, the only evidence in the record on this issue is Agent Destito's testimony.  That

evidence, however, is not disputed by any other testimony, affidavits, or declarations.  Destito

testified under oath that Doud advised Goding of her Miranda rights and she agreed to speak with

them.  Hr'g Tr. at 134, 140.  Through counsel, Goding points out the <u>Miranda</u> warnings were not

read from a pre-printed form, the questioning was not recorded, and she did not acknowledge her

rights or a waiver in writing.  (Doc. 67 at 14.)  A written waiver, however, is not required.  <u>United

States v. Boston</u>, 508 F.2d 1171, 1175 (2d Cir. 1974); <u>see</u> <u>United States v. Newton</u>, 11-cr-50,

2012 WL 170008, at *3 (D. Vt. Jan. 19, 2012) (citing cases).  Neither is a recording or a pre-printed

form.  <u>See, e.g.</u>, <u>United States v. Hasan</u>, 747 F. Supp. 2d 642, 669 (E.D. Va. 2010) (finding "no basis

for any claim of a constitutional requirement that the <u>Miranda</u> warnings be recorded by audio, video,

or memorialized in a written record.").

The burden is indeed on the government, but a conclusory statement (in the last sentence of

her counsel's conclusion paragraph) that her waiver was involuntary is insufficient to overcome

Destito's testimony.  The Court credits his uncontradicted testimony.  "The fact that a suspect

chooses to speak after being informed of his rights is, of course, highly probative."  <u>Elstad</u>, 470 U.S.

at 318.  Based on the facts before it, the Court finds the government has met its burden to

demonstrate Goding received and validly waived her <u>Miranda</u> rights and her "statements to agents

were 'the product of a free and deliberate choice rather than intimidation, coercion or deception.'"

<u>Suarez</u>, 2006 WL 3543616, at *7 (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)); <u>see</u> <u>id.</u>

("There is nothing on the record or in the Defendant's affidavit which casts doubt on [the agent's]

testimony that Defendant made a voluntary choice . . . .  In his supporting affidavit, Defendant does

not claim that his statements were coerced, nor is there any evidence to show that his statements

were the product of coercion by officers."); <u>United States v. Hsu</u>, 852 F.2d 407, 411 (9th Cir. 1988)

("The court had to make a credibility determination; in the absence of any independent evidence

suggesting that fresh warnings were not given, it was not erroneous for the court to accept the

version of events to which [the agents] testified." (citations omitted)).[10]

       Goding's motion is therefore denied.

IV.    <u>Conclusion</u>

       For the above reasons, Trapp's motion to suppress evidence (Doc. 44) is DENIED.

Goding's motions to suppress evidence (Docs. 45, 67) are DENIED.

       This case will be placed on the April 30, 2014 jury draw calendar..

       SO ORDERED.

       Dated at Brattleboro, in the District of Vermont, this 20th day of March, 2014.


                               /s/ J. Garvan Murtha
                               Honorable J. Garvan Murtha
                               United States District Judge

---

[10]  The Court notes it infers nothing from Goding's decision not to testify at the suppression hearing.  The government's evidence has simply not been contradicted.  <u>See</u> <u>United States v. Male Juvenile</u>, 121 F.3d 34, 42 (2d Cir. 1997) ("government's evidence of waiver was uncontradicted because defendant chose not to take the stand at the suppression hearing and rebut government's version of events even though he might have done so without risk that anything he said could be later used against him at trial." (describing <u>United States v. Mullens</u>, 536 F.2d 997, 1000 (2d Cir. 1976))); <u>Ferranti v. United States</u>, 480 F. App'x 634, 639 (2d Cir. 2012).